## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUSSAIN SALEM MOHAMMED ALMERFEDI, et al.,  )<br><br>Petitioners,  )<br><br>v.  )<br><br>GEORGE W. BUSH, et al.,  )<br><br>Respondents.  ) | Civil Action No. 05-1645 (PLF) |
| WALEED SAEED BN SAEED ZAID, et al.,  )<br><br>Petitioners,  )<br><br>v.  )<br><br>GEORGE W. BUSH, et al.,  )<br><br>Respondents.  ) | Civil Action No. 05-1646 (PLF) |

## PETITIONERS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR AN ORDER REQUIRING ADVANCE NOTICE
## OF ANY REPATRIATIONS OR TRANSFERS FROM GUANTANAMO

## INTRODUCTION

Pending before the Court are motions of habeas petitioners' Hussain Salem
Mohammed Almerfedi ("Petitioner Almerfedi") and Waleed Saeed Bn Saeed Zaid
("Petitioner Zaid"), seeking orders requiring respondents to give 30-days notice of their

intention to remove petitioners from Guantanamo during the pendency of these habeas proceedings.[1]  Respondent opposes giving any such notice.  Respondents' Memorandum in Opposition to Petitioners' Motion for Preliminary Injunction Requiring Advance Notice of Transfer or Release (Aug. 22, 2005) ("Resp. Br.").  This Court has addressed the same issue on at least two prior occasions and, as requested here, ordered the government to give petitioners' counsel 30 days' advance notice before removing petitioners from Guantanamo Bay.  *Al-Shiry v. Bush,* Slip Op, 2005 WL 1384680 (D.C.D.C.); *Mokit v. Bush*, 374 F.Supp.2d 106 (D.C.D.C. 2005).  Nothing in respondent's opposition requires a contrary result.

Respondent asserts the right to transfer petitioners, and all other detainees, to their country of citizenship or some other country with an interest in a detainee, without any opportunity for judicial review.  This Court's ability to enforce its orders, if lost, will be impossible to regain.  Petitioners' requested relief does nothing more than preserve this Court's jurisdiction and ability to enforce any future orders.  Respondents are simply wrong in claiming that this Court must stand aside and permit the transfer of illegally-held prisoners into the custody of a torture-practicing foreign state, in violation of the United States' obligations under international and domestic law.  Petitioners' motion should be granted.

---

[1] Their petitions for writs of habeas corpus were filed simultaneously on August 11, 2005.  Both petitioners have been detained for long periods of time at Guantanamo, both are Yemeni nationals, and both are represented by the same counsel.  Respondents urge that it was improper to file the two petitions as "related cases" and argues, hyperbolically, that it is an attempt to elevate the *Almerfedi* case to the most prominent position among the 140 Guantanamo habeas cases currently before this Court.  Respondents' Objection to Petitioners' Related Case Designation (Aug. 22, 2005).  Counsel for petitioners simply wish to promote judicial economy and convenience and were following the instructions of the Court Clerk and the Court's forms, the latter of which specifies that cases can be joined if they "involve[] common issues of fact."  Notice of Designation of Related Civil Cases Pending, Clerk's Office form CO-932, U.S. District Court for the District of Columbia.  Because respondents have filed a single response to both motions, petitioners will follow the same practice.

### THE FACTS ALLEGED AND THE
### FACTUAL INCONSISTENCIES IN RESPONDENT'S ASSERTIONS

Petitioner Almerfedi is a native of Yemen. He was taken by U.S forces in Yemen, possibly as early as 2001, and transferred to the detention facility at Guantanamo. *See* Exhibit 1 to the Declaration of Judith Brown Chomsky (Aug. 10, 2005) (accompanying Hussain Salem Mohammed Almerfedi's Petition for Writ of Habeas Corpus). Petitioner Zaid is also a native of Yemen. He was taken by U.S .forces, probably in Pakistan in 2002, and transferred to the detention facility at Guantanamo. *See* Exhibit 2 to the Declaration of Judith Brown Chomsky (Aug. 10, 2005) (accompanying Waleed Saeed Bn Saeed Zaid's Petition for Writ of Habeas Corpus). Both petitioners face possible transfer to custody in Yemen by virtue of their Yemeni citizenship. Respondents are currently negotiating with other countries to facilitate the return of Guantanamo detainees en masse to their countries of citizenship, including Yemen. Robin Wright and Josh White, *U.S. Holding Talks on the Return of Detainees: Administration Close to Reaching Agreements with 10 Muslim Countries*, Washington Post (Aug. 9, 2005) at A13. As described in detail below, Yemen has a well documented record for using torture and otherwise violating international law in its handling of detainees. Several former Guantanamo detainees who are Yemeni nationals recently reported being transferred to unknown locations where they were tortured and then to Yemen, where they are currently being detained indefinitely and without trial at the behest of the U.S. government. Amnesty International, *Torture and Secret Detention: Testimony of the 'Disappeared' in the 'War on Terror,'* (Aug. 4, 2005), *available at* http://web.amnesty.org/library/index/engamr511082005 (last visited Aug. 29, 2005).

3

According to the June 2, 2005 Declaration of Matthew C. Waxman on behalf of the respondents:

a.    The DoD determines "whether continued detention is warranted based on factors such as whether a detainee continues to pose a threat to the United States or its allies." ¶3

b.    Detainees are transferred to the control of another country "under appropriate circumstances" [which are not identified], "when those governments are willing to accept responsibility for ensuring...that the detainees will not continue to pose a threat to the United States and its allies." ¶3

c.    "[T]he detainee is transferred entirely to the custody and control of the other government, and once transferred, is no longer in the custody or control of the United States; the individual is detained, if at all, by the government... not on behalf of the United States." ¶5

d.    Where the transfer is proposed to a country which respondents believe it is "more likely than not that [the detainees] will be tortured" a process is undertaken in which "assurances regarding the detainee's treatment are sought from the country to whom [sic] transfer is proposed." ¶6

Respondent thus puts forward a series of inconsistent propositions to support its opposition to the requested notice. Respondent simultaneously asserts that: 1) once transfer to another country occurs, the United States will have no control over the petitioners and that they will be treated pursuant to the laws of the other country; and 2) transfers only occur where respondent has received assurances that transferee country will prevent them from posing a threat to the U.S. and its allies and where respondent has been assured that the transferee country will abide by it obligations under international law. No explanation is given of how these "assurances" will translate into conduct by the transferee country. As described in petitioners' motions and as set forth more fully below, Yemen does not abide by either intentional law or even its own domestic law with regard to the treatment of those in custody.

4

## ARGUMENT

**I.    THE COURT HAS THE POWER TO ISSUE THE REQUESTED RELIEF**

It is clear that this Court has jurisdiction to hear the habeas petitions of detainees, like petitioners herein, to challenge their detention at Guantanamo Bay. *Rasul v. Bush,* 542 U.S. 466, 124 S.Ct. 2686, 2698 (2004). "Accordingly, the Court must also have authority to preserve this jurisdiction if it can be shown that respondents are acting to circumvent it." *Kumaz. Bush,* 2005 WL 839542 *2 (D.D.C.) (citing All Writs Act, 28 U.S.C. § 1651(a)). *See also, Al-Marri v. Bush,* No. 04-2035 (D.D.C. filed April 4, 2005) (order granting preliminary injunction); *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C. Cir. 1996) (holding that the All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"); *Abu All v. Ashcroft,* 350 F.Supp.2d 28, 54 (D.D.C. 2004) (federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties" of their right to sue in federal court) (internal citation omitted). Respondent does not deny that it is engaged in communications over the transfer of Yemeni detainees, like petitioners, to Yemen. If the Court chooses not to issue the injunction giving petitioner notice prior to any transfer, it is likely to lose jurisdiction over the habeas proceedings.

Further, the law does not support respondent's position that the Court cannot inquire into its transfer decisions. Respondent relies entirely on case law arising out of extradition proceedings but its lengthy discussion of extradition proceedings is simply beside the point. *See* Resp. Br. at 21-23. This is not an "extradition" issue, for the government in no way claims and its decisions on rendition do not follow the formal process of extradition or its attendant procedural protections at all. Even if it were,

5

petitioners also have raised a claim that their *current* detention is illegal under United States law, and the Supreme Court has expressly held that this Court has jurisdiction over petitioners' substantive claims. In sum, the "rule of non-inquiry" posited by the respondents may or may not limit the inquiries conducted in extradition proceedings, but this is not an extradition case, and the rule in any event cannot prevent federal courts from acting to protect their own jurisdiction over an underlying substantive claim in an already-existing case.

## II.    THE PETITIONERS' REQUESTS SATISFY THE PRELIMINARY INJUNCTION STANDARD

The standard this court should apply was expressed in *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). That case held that: "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.*

### A.    It Cannot be Reasonably Disputed that Petitioners Will Suffer Irreparable Harm if They are Rendered to a Foreign Nation Without Notice or Any Opportunity to Be Heard

There is ample evidence both that: (1) petitioners are subject to a very real risk of being rendered into the custody of a foreign government, and (2) Yemen, the most likely country to which they would be sent, routinely engages in torture.

As to the potential transfer of petitioners to Yemen, recent news reports have indicated that the United States has concluded negotiations over the rendition of Guantanamo detainees to Yemen. Robin Wright and Josh White, *U.S. Holding Talks on*

6

*the Return of Detainees: Administration Close to Reaching Agreements with 10 Muslim Countries*, Washington Post (Aug. 9, 2005) at A13. Respondents' own affidavits assert that "[t]he United States has no interest in detaining enemy combatants longer than necessary," and that judicial review of a decision to transfer the petitioners may "undermine the United States' ability to reduce the number of individuals under U.S. control." Prosper Decl. at ¶ 2 & 12. Around 70 detainees have already been transferred from Guantanamo into the custody of other governments, and this number does not even include the numerous other detainees transferred to foreign governments from facilities other than Guantanamo, or those transfers that the respondents do not wish to publicly acknowledge. Robin Wright and Josh White, *Afghanistan Agrees to Accept Detainees*, Washington Post (Aug. 5, 2005) at A1. Thus, petitioners face the likelihood that they will be removed from the jurisdiction of the Court.

On the issue of whether Yemen is a country likely to engage in torture, the U.S. government itself has provided ample support for the conclusion that it in fact is. The U.S. State Department's *Country Reports on Human Rights Practices, 2004* described the Yemeni criminal justice system as follows:

> [T]here were reports that members of the...police forces tortured and abused persons in detention. There were also reports that authorities used force during interrogations, especially against those arrested for violent crimes...[T]here were reports [of] abuse such as sleep deprivation, cold water, and threats of sexual assaults. There were reports that the CID routinely used torture in order to obtain confessions...The Constitution may be interpreted as permitting amputations, in accordance with Shari'a (Islamic law), and physical punishment such as flogging for some crimes.

> ...Prisons were extremely overcrowded, sanitary conditions were poor, and food and health care were inadequate to nonexistent. Prison authorities often exacted bribes from prisoners to obtain privileges, or refused to release prisoners who completed their sentences until family members paid a bribe. In some cases, authorities arrested without charge and held

7

refugees, persons with mental disabilities, and illegal immigrants in
prisons with common criminals.

...[A]rbitrary arrest and prolonged detention without charge remained
common practices.

...A large percentage of the total prison population consisted of pretrial
detainees, some of whom have been imprisoned for years without charge.

*Country Reports on Human Rights Practices, 2004*, U.S. Department of State, (released

in February 2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41736.htm (last

visited at August 29, 2005).

Moreover, non-governmental organizations have long reported that the Yemeni

government has engaged in torture and human rights abuses of people in its custody,

especially in the last decade. In a September 2003 report, Amnesty International ("AI")

described how Yemen's enforcement of laws against torture had significantly

deteriorated since the September 11, 2001 attacks. Amnesty International, *Yemen: The*

*Rule of Law Sidelined in the Name of Security* (Sept. 24, 2003), *available at*

http://web.amnesty.org/library/Index/ENGMDE310062003?open&of=ENG-YEM (last

visited August 29, 2005). Specifically referencing detainees held on suspicions of

terrorist activity in connection with the U.S.S. Cole and September 11, 2001 incidents in

Yemen, the report noted that "[s]ome detainees said that they were not tortured ... but

others said they were beaten with electric batons, handcuffed and shackled, and subjected

to insults and verbal abuse. Others said they were threatened with the imprisonment of

their female relatives if they did not confess." *Id.* at 8. AI referenced a statement made

by Yemen's Minister of Interior to Parliament on July 16, 2003, in which he said that 195

people accused of belonging to Al Qaeda remained detained. *Id.* at 1. AI then concluded

that the Minister "did not refer to any judicial process for these detainees because the rule

of law has been sidelined. They are held totally at the mercy of the government and security forces, far removed from judicial scrutiny." *Id.* In the weeks and months following the Minister's statement, "[a]rrests were made without the judicial supervision required by law, and detainees have invariably been subjected to lengthy incommunicado detention, during which some of the detainees alleged that they were tortured or ill-treated." *Id.* Moreover, Yemen's "authorities, while recognizing that they were in breach of their international human rights obligations and their own laws, argued that this was because they had to 'fight terrorism' and avert the risks of military action against Yemen by the US in the wake of the 11 September events." *Id.* at 3; *see also id.* at 6 ("After 11 September, the government's message to Amnesty International has been articulated as the 'fight against terrorism' to preserve the security of the country which necessitates action by the arresting authorities beyond the confines of the law and Yemen's international human rights obligations."). The report concludes by noting how "the Yemeni Government has sidelined the rule of law and its human rights obligations in the name of 'fighting terrorism' and 'national security.' It has given the green light to the security forces, particularly the Political Security, to act with impunity in total disregard for the law and the role of the judiciary.... What is more disturbing about these human rights violations is that they are being carried out as a deliberate policy by the government." *Id.* at 26.

Against this evidence of the use of torture, respondent holds out the assertion that it will not hand over detainees to countries likely to use torture without "assurances" from the other country that it would abide by its international obligations. See Waxman Declaration at ¶6. This is inconsistent with respondent's assertion that once the turnover

takes place, the detainees would be wholly in the custody and control of the receiving

country. Waxman Declaration at ¶4. Under such circumstances, respondent would have

no capacity to ensure that the assurances would be followed and therefore there is no

support for the conclusion that petitioners would not be subject to torture.

Again, it is the government's own statements which make clear how meaningless

such assurances would be, if they were in fact to be given. The U.S. State Department

itself has acknowledged Yemen's widespread failures to abide by its own laws and

assurances. *See id.* at 3-4 ("The law prohibits arbitrary arrest and detention; however, the

Government generally did not observe these prohibitions. Enforcement of the law was

irregular and in some cases nonexistent, particularly in cases involving security

offenses."); *id.* at 4 ("The law stipulates that a detainee may not be held longer than 7

days without a court order. Despite these constitutional and other legal provisions,

arbitrary arrest and prolonged detention without charge remained common practices.");

*id.* . ("A large percentage of the total prison population consisted of pretrial detainees,

some of whom have been imprisoned for years without charge."). The State Department

report also provides little hope that petitioners' rights will be protected by Yemen's

judiciary. *See id.* at 5 ("The Constitution provides for an 'autonomous' judiciary and

independent judges; however, the judiciary was weak and severely hampered by

corruption and executive branch interference. The executive branch appoints judges,

removable at the executive's discretion. There were reports that some judges were

harassed, reassigned, or removed from office following rulings against the Government.

Many litigants maintained, and the Government acknowledged, that a judge's social ties

and occasional bribery influenced the verdict more than the law or the facts."); *id.*

("Citizens and human rights groups alleged that the security forces and judiciary did not observe due process in most cases."); *id.* at 10 ("Corruption was a problem, particularly in the judicial branch."). Moreover, even if a Yemeni judge weighs in, additional concerns about the enforceability and the reach of their orders persist. *See id.* at 4 ("The judiciary was hampered further by the Government's frequent reluctance to enforce judgments."); *id.* ("The Government failed to ensure that detainees and prisoners were incarcerated only in authorized detention facilities. The Ministry of Interior and the PSO operated extrajudicial detention facilities.").

The need for this Court to grant the requested relief is especially pressing due to the increasing number of accounts in which respondents have engaged in extraordinary rendition, particularly to avoid judicial orders and judgments. For example, when another judge of this Court recently found that the allegations of Omar Abu Ali – an American citizen claiming that he was being detained and tortured in Saudi Arabia at the direction of the United States – were sufficiently credible to warrant jurisdictional discovery, *see Ali v. Ashcroft*, No. 04-1258 (JDB), 2004 U.S. Dist. LEXIS 25239, at *122, (D.D.C., filed Dec. 16, 2004), the United States acted to moot Ali's habeas case by returning him to the United States to face criminal proceedings. *See* Daniel Eisenberg, *The Rough Justice of War*, Time Magazine, Mar. 7, 2005 (attached as Exhibit 1).

Respondents' documented practice of transferring suspects outside the United States substantiates petitioners' fears of being deprived of United States judicial protection. Moreover, whether petitioners are subject to a transfer tomorrow, or next week, or the week after that, such facts are exclusively within the control of the respondents. In sum, there is substantial evidence of respondents engaging in the practice

11

of rendition, the most compelling of which is respondents' own statement that they will not disclose whether or when such transfers will take place. Clearly, the petitioners have presented a sufficiently severe and substantial risk of harm to justify the limited injunctive relief requested here.

**B.    The Requested Injunction Would Cause No Cognizable Harm to Respondents**

The only harm that respondents allege might result from this injunction is that it would "trample on the separation of powers." Resp. Br. at 24. However, as the Supreme Court recently made clear in *Rasul*, the conduct of the executive branch in the detention of prisoners in Guantanamo is subject to judicial review. *See*, *Rasul*, 542 U.S. 466. More specifically, as this Court held in *Al-Marri*, involving a Qatari Guantanamo detainee:

> The Court fails to see any injury whatsoever that the Government would suffer from granting the requested preliminary injunction. Petitioner requests only 30 days' notice of transfer--a narrow and discrete request that would impose no burden on the Government. Beyond "vague premonitions" that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority...For example, granting Petitioner's request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice.

*Al-Marri v. Bush*, 2005 WL 774843 (D.D.C. 2005) at *6 (granting a preliminary injunction for 30-days notice of intent to transfer detainee) (internal citations omitted). Furthermore, this Court may lift or modify an injunction if the respondent can demonstrate a justification for doing so and the *only* effect that the requested injunction would have in this case would be to permit the petitioners to challenge a transfer, and prevent the possible loss of this Court's jurisdiction, before that transfer takes place.

12

Respondent's asserted concern over the "disclosure" of confidential communications with a foreign government is a mere chimera. Respondent alleges that "public" disclosures would have a "chilling effect" on the conduct of foreign relations. Resp. Br. at 7. However, procedures are already in place whereby counsel for Guantanamo detainees have access to extensive information that will not be shared either with the public or even with their clients. Respondents have failed to identify any manner in which "sensitive" negotiations would be affected if information about a proposed transfer were to be "disclosed" only to the Court and counsel in this case, in the context of sealed communications reviewable only in the secure facilities that have already been established.

C.     **Public Policy Clearly Favors the Requested Notice**

Respondent argues that public policy favors non-intervention because the conduct of the government "conforms to law." Resp. Br. at 25-26 (quoting *Al-Anazi*, 370 F.Supp. at 199). Respondent further asserts that review is unnecessary because existing policies and processes governing transfers already serve the public policy against torture. Resp. Br. at 25. In effect, respondent argues for unreviewable discretion. This is the same unfettered discretion have been repeatedly rejected by the federal courts in recent cases, including the Supreme Court's decision in *Rasul*, *supra*. Petitioners, who are properly before this court, are entitled to an opportunity to contest a transfer which would place them outside the Court's jurisdiction or into the hands of torturers.

D.     **Petitioners' Underlying Claims Are Substantial and Should Not be Terminated by the Respondents' Unilateral Actions**

While respondents steadfastly refuse to recognize the fact, there can be no real dispute that the petitioners have presented substantial claims that should be heard by this

13

Court without unilateral interference by the respondents.  The Supreme Court itself has noted the viability of petitioners' habeas corpus claim:

> Petitioners' allegations – that, although they have engaged neither in combat nor in acts of terrorism … they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing – unquestionably describe "custody in violation of the Constitution or laws or treaties of the United States.

*Rasul v. Bush*, 124 S. Ct. 2686, 2698 n.15 (2004) (citing 28 U.S.C. § 2241(c)(3)).  Judge Green of this Court, in her January 31, 2005 Order in the consolidated Guantanamo Cases, followed the Supreme Court's direction and rejected many of the same arguments made by Respondents here.  Civil Action No. 02-0299 and consolidated cases (D.D.C., filed Jan. 31, 2005).  In particular, Judge Green found that the Guantanamo detainees in eleven consolidated cases stated viable claims under the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Third Geneva Convention.

The issue is not whether petitioners might have standing to file a separate lawsuit alleging independent grounds to block the Government's planned transfers if they were otherwise not in Court.[2]  Instead, the salient question is whether this Court, having already accepted jurisdiction over a live controversy, may act to preserve its jurisdiction already properly exercised.  The answer to that question is clearly yes.

It is also important to note here that it is not even clear that this motion will ever prevent any transfers the government wishes to effect.  Indeed, petitioners may never

---

[2] Although unnecessary to the resolution of this motion, which does not ask this Court to rule on any substantive claims, petitioners continue to submit that they do possess such independent rights to the ATS for violations of customary law prohibiting torture, crimes against humanity, war crimes and arbitrary, prolonged detention. As noted, however, no ruling on these issues is necessary – preliminary injunctive relief rarely resolves substantive rights; it merely preserves the status quo while the disputes are addressed in litigation.

even try to prevent any future transfers. All that is sought here is the modest relief of 30 days' advance notice of the government's intent to transfer the petitioners. If that motion is granted and the government provides such notice, petitioners may well decide not to challenge the government's proposed transfers. Alternatively, if the motion is granted, the government may decide not to render these petitioners into another country's detention.

In sum, the limited relief petitioners' motion seeks is quite modest. Given the very limited relief sought by petitioners here, and the severe harm petitioners would suffer if they lost meaningful access to this Court and were rendered to Yemen, the balance of factors to be considered by this Court weighs heavily in petitioners' favor, and the motion should be granted.

## III.    DENIAL OF THE MOTION WOULD BE IMPROPER BEFORE DISCOVERY IN ANY EVENT

There can be no doubt – and respondents do not deny – that this Court may order discovery in a habeas corpus case. Respondents also must acknowledge that: (1) petitioners have been held incommunicado, and (2) the facts surrounding petitioners' potential transfer lie exclusively within respondent's possession. Respondent is seeking here to use their exclusive control of the facts as a weapon, by presenting this Court with generalities of supposed procedures while refusing disclosures of any details applicable to petitioners themselves. Respondent's declarations, for example, provide no detail as to how well, when, or even if these generalized procedures are followed, and provide nothing by which the Court may gauge the accuracy of the respondents' assertions.

Petitioners submit that they have established a strong and adequate basis for their motion to be granted. Nevertheless, given that respondent has sole possession of all the

15

facts needed to successfully challenge a decision to render petitioners to the custody of a foreign government, and yet have submitted only generalized, limited declarations, Petitioners also submit that this Court, if it is inclined to deny this motion, should first allow petitioners to engage in limited discovery in an effort to support their request for relief. That discovery should, at a minimum, permit petitioners to inquire of the Declarants as to the factual basis of their assertions.[3]

Given the uncertain status of the petitioners and the government's apparent plans to render them to the custody of a foreign state, petitioners also respectfully request that the Court hold an evidentiary hearing on this motion as expeditiously as possible. Counsel would have no objection to our motion being consolidated with other motions being heard by this Court arising out of the prospective transfer of prisoners from Guantanamo.

---

[3] Indeed, the Declarations should be stricken if Respondents are unwilling to make these individuals available for examination. It is obvious that Respondents cannot fairly introduce one-sided Declarations and then try to stay all proceedings, as they seek to do in this case. These Declarations cannot be credited.

## CONCLUSION

For the foregoing reasons, petitioners respectfully request this Court to grant the motion, to ensure that the Court retains jurisdiction over petitioners' claims, to allow for petitioners to meaningfully petition this Court, and to prevent the torture of petitioners.

Dated:  August 30, 2005.

Respectfully submitted,

Counsel for Petitioners:

_____/s/_____
Judith Brown Chomsky, Esq. (PA21537)
LAW OFFICES OF JUDITH BROWN
CHOMSKY
Post Office Box 29726
Elkins Park, PA 19027
Telephone: (215) 782-8367
Facsimile: (215) 782-8368