IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WALEED SAEED BN SAEED ZAID, et al., | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 05-1646 (JDB) |
| GEORGE W. BUSH, et al., | ) ) ) | |
| Respondents. | ) ) ) | |

**MEMORANDUM IN OPPOSITION TO MOTION TO STAY PROCEEDINGS
AND REPLY IN SUPPORT OF AN ORDER TO SHOW CAUSE**

**I. Introduction.**

Petitioner Waleed Saeed Bn Saeed Zaid ("Petitioner") and his next friend object to the Respondents' Motion to Stay Proceedings Pending Related Appeals and for Continued Coordination and Memorandum in Opposition to Petitioners' Motion for an Order to Show Cause ("Respondents' Motion"). Additionally, however, there appear to be several areas in which Petitioner and Respondents do not disagree, and which can be disposed of summarily by the Court:

(1) Respondents agree to have the protective orders entered;

(2) Respondents have agreed to permit contact between counsel and client;

(3) Presumably, Respondents agree to continue to process and issue security clearances.

1

Respondents' Motion at 2 (though the third point is not stated explicitly in the Respondents' Motion, it is necessarily implied by the first two points).

The only area that needs the Court's attention now is Respondents' reluctance to provide a factual return and participate in a subsequent § 2243 hearing.

## II.    Factual Background

Petitioner is a national of Yemen. Zaid Petition ¶ 3. He is being unlawfully detained by the Respondents at the United States Naval Station at Guantanamo Bay, Cuba. Id. Respondents have not disclosed any basis for the Petitioner's detention, have not stated the nature of the charges against the Petitioner, and have not provided any basis for the Court to conclude that the Petitioner is being lawfully detained.

On August 11, 2005, Petitioner filed a petition for *habeas corpus* and declaratory relief. Respondents have filed no return. On August 30, 2005, Petitioner filed a Motion for an Order to Show Cause why the writ should not be granted immediately. Respondents now seek to stay these proceedings altogether. Specifically, they seek: (i) an indefinite stay of this proceeding, and (ii) indefinite relief from any obligation to address the basis of Petitioner's continuing unlawful detention.

## III.  Argument

### A.    The Motion to Stay Should Be Denied

#### 1.    A Stay Would Offend 28 U.S.C. §2243 and Petitioner's Rights to Speedy Trial

Despite Respondents' characterization of their motion as merely procedural, the relief requested is substantive. A stay of the proceedings would constitute a continuation of the unlawful detention without a hearing – the basis of Petitioner's complaint.

2

Congress, in plain terms, has prohibited unlimited and unjustified detention. Habeas petitions are to be promptly addressed. The statute provides that Respondents must make return "within three days unless for good cause additional time, *not exceeding twenty days*, is allowed." 28 U.S.C. § 2243 (emphasis added). The day set for hearing must be "not more than five days after the return unless for good cause additional time is allowed." *Id*. Even a lawful detention must be abbreviated, and speedy-trial laws require military and other courts to free prisoners who are not quickly given a full hearing. *See* Article 10 of the Uniform Code of Military Justice. Article 103 of the Third Geneva Convention sets out a 90-day limit to unreviewed detentions. The grant of a stay here would contradict these plain expressions of Congressional intent and international law.

The need for a prompt hearing is never greater than where, as here, the Executive has afforded to Petitioner no judicial review. *See Rasul v. Bush*, 124 S. Ct. 2686, 2692 (2204); *INS v. St. Cyr,* 533 U.S. 289, 301 (2001). The deference appropriately accorded by the Judicial to the Executive Branch in the exercise of the latter's war powers should no longer delay these proceedings. The Supreme Court has ruled that detainees in Guantanamo are entitled to some measure of due process, and has specifically considered and rejected the proposition that judicial review will intrude upon the powers delegated to the executive under Article II. *Rasul*, 124 S. Ct. at 2692.

## 2. A Balance of the Equities Requires Denial of the Motions.

Every litigation raises questions – usually routine – about that case's timetable. The government's papers suggest that it is making an administrative request, invoking familiar administrative notions such as judicial efficiency and the pendency of related proceedings. However, the requested Order is neither procedural nor routine, but rather, in the context of this litigation, substantive and extraordinary.

3

Here, the timetable *is* the case, and the problem is made more poignant and urgent by the extent to which process has already swallowed substance. The government in related cases has deployed motion practice in a masterful campaign and dodged the trial court for more than three years. Now, the Respondents seek permission to circumvent the precise result that the Supreme Court has required, that the *district courts* "hear petitioners' habeas corpus challenges." *Id*. If the motion were to be granted, hearings could be postponed for years. The government is, in effect, requesting that this Court ignore *Rasul* by entering an Order that has the effect of contravening that case's central holding.

### (a)     *The Harm to the Petitioner*

Because counsel have not yet been permitted by the government to communicate with their client, counsel cannot advise the Court of the precise length of his detention. However, on information and belief, Petitioner has been detained in excess of two years. *See* Zaid Petition, Exhibit A (communication from next friend). To date, the government has not provided any basis to contest this assertion.

Much is known about the conditions of detainee confinement.[1] What is clear is a disturbing record of abuse of detainees. Detainees are deprived of contact with their families

---

[1] *See, e.g.*, United Nations Press Release, "United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees," Feb. 4, 2005; International Committee of the Red Cross, Press Release, "The ICRC's Work at Guantánamo Bay," Nov. 30, 2004; International Committee of the Red Cross, Operational Update, "US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC," July 26, 2004; Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the 'War on Terror'*, at 22 (Oct. 27, 2004) (available at http://web.amnesty.org/library/Index/ENGAMR 511452004); *see also* Barry C. Scheck, *Abuse of Detainees at Guantanamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers Champion, Nov. 2004, at 4-5; Action Memo from William J. Haynes II, General Counsel, DOD, to Secretary of Defense (Nov. 27, 2002); *Pentagon Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations*, at 62-65 (Apr. 4, 2003); Neil A. Lewis, "Red Cross Finds Detainee Abuse in Guantánamo," *New York Times*, Nov. 30, 2004, at A1; M. Gregg Bloche and Jonathan H. Marks, "When Doctors Go to War," *New England Journal of Medicine*, Jan. 6, 2005, at 3-4; *Guantánamo: An Icon of Lawlessness*, Amnesty International, Jan. 6, 2005, at 3-5; *see also* Neil A. Lewis, "Fresh Details Emerge on Harsh Methods at Guantánamo," *New York Times*, Jan. 1, 2005, at A11; Carol D. Leonnig, "Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos," *Washington Post*, Dec. 26, 2004, at A1; Neil A. Lewis and David Johnston, "New F.B.I. Memos Describe Abuses of Iraq Inmates," *New York Times*, Dec. 21, 2004, at A1; Dan

and counsel. Many have been subjected to coerced interrogations. Many have complained of psychological and physical abuse. A substantial body of information from sources other than detainees (including military personnel and the International Red Cross) demonstrates that abusive conditions have been the widespread. Numerous reports have documented the isolation, fear, and depression experienced by detainees, the shackling, the humiliation, the physical and psychological abuse. These reports document that the hardship is, in the words of the International Red Cross, "tantamount to torture." Neil A. Lewis, "Red Cross Finds Detainee Abuse in Guantánamo," *New York Times*, Nov. 30, 2004, at A1. Continuing detention prolongs these hardships for the Petitioners.

The stay sought by the Respondents is of long and indefinite nature. When the rulings in *Khalid v. Bush*, *Boumediene v. Bush*, Nos. 04-CV-1142 (RJL), 04-CV-1166 (RJL), 355 F. Supp. 2d 311 (D.D.C. 2005), *appeals docketed*, Nos. 05-5062, 05-5063 (D.C. Cir. Mar 2, 2005), and *In re Guantanamo Detainee Cases*, No. 02-CV-0299, *et al.*, 355 F. Supp. 2d 443 (D.D.C. 2005), *appeal on petition for interlocutory appeal*, No. 05-5064 (D.C. Cir. Mar. 10, 2005), are handed down, if adverse to the government, they will likely be met with *certiorari* petitions, requests for more stays, and perhaps another Supreme Court appeal. The current Motion means that the Petitioner would face yet more *months* in a state of imprisonment, isolation, and abuse, before he could even begin to know the allegations against him, let alone prepare his case. The Respondents' Motion is just another phase in the appellate war of attrition the government is undertaking to avoid effectuating the promise of the "Great Writ."

---

Eggen and R. Jeffrey Smith, "FBI Agents Allege Abuse of Detainees at Guantánamo Bay," *Washington Post*, Dec. 21, 2004, at A1; Neil A. Lewis, "F.B.I. Memos Criticized Practices at Guantánamo," *New York Times*, Dec. 7, 2004, at A19; Associated Press, *Gitmo Soldier Details Sexual Tactics*, Jan. 27, 2005; Sam Hannel, "Lawyers Describe Guantánamo Detainees," *Seattle Post-Intelligencer*, Jan. 19, 2005; Eric Lichtblau, "Gonzales Says '02 Policy on Detainees Doesn't Bind CIA," *New York Times*, Jan. 19, 2005, at A17; Dan Eggen and Charles Babington, "Torture by U.S. Personnel Illegal, Gonzales Tells Senate," *Washington Post*, Jan. 18, 2005, at A4.

The harm to the Petitioner is the deprivation of his right to seek judicial relief to ensure his life, safety, and freedom. This harm is substantial, real, and immediate.

### (b)   *The "Harm" to the Government's Lawyers*

The government contends that responding to the habeas petitions burdens its lawyers. Respondents' Motion at 12. This argument should not be taken seriously and is discussed at greater length below, in Section B.2. The suggestion that the burden of processing and filing of factual returns somehow compares to that of being detained indefinitely and abused is morally, factually, and legally absurd. The Executive cannot imprison people indefinitely on the basis that it hasn't enough lawyers to explain why it is doing so. If the United States can incur the expense of detaining the Petitioner, then it can afford to employ more counsel. When the Supreme Court decided in *Rasul* that the judicial branch has jurisdiction over these claims, the Court undoubtedly understood that its decision would require the government to assign lawyers to answer and litigate the claims. The fact that the government's lawyers have to work on the case is not a consideration for whether the stay should be ordered.

### (c)   *Judicial Efficiency is Best Served by Denying the Motion.*

Judicial efficiency will be served best by moving the filed Guantanamo cases, including those of the Petitioner, forward immediately. According to the government, there are around five hundred detainees in Guantanamo. Already, at least 260 detainees have filed petitions for habeas corpus – the vast majority of these in the last seven and a half months. *See* Respondents' Motion at 3, 7. It is to be expected that many of the currently unrepresented detainees will also soon be filing habeas petitions.

Staying cases now risks procedural gridlock later. Were the proposed stay to be granted, when it is later lifted, there are likely to be upwards of a hundred factual returns that the Respondents' will have to produce and an equivalent number of § 2243 hearings for the

Court to entertain. Scheduling those hearings will be a nightmare, and the resulting delay will play into Respondents' strategy of prolonging this litigation as a way to continue detaining individuals without showing cause. As far as judicial efficiency is concerned, it makes far more sense to move cases forward as they are filed, rather than to invite this inevitable backlog.

A prompt and timely development of a factual record, with well-supported findings, also makes future appeals far more easy, and will tend to preclude the time consuming remand. For these reasons, judicial economy will best be served by moving the Petitioner's case forward now.

### 3. Public Interest Favors Denial of a Stay

Respondents assert that the government is acting in the public interest. With the passage of time, it grows more and more difficult to take this position seriously. For example, it is difficult to understand how, after years of detention, a Petitioner not charged or tried might still represent a "threat," or a source of useful information (even assuming, as the government contends and as we deny, that either factor would have justified the Petitioner's detention at Guantanamo in the first place.)

We submit that the public interest now lies precisely the other way. The continued exercise of naked power by the Executive has wounded the nation's reputation abroad and threatens its institutions at home. It imperils public faith in what has been a cornerstone of our freedoms: meaningful judicial review. In short, the public interest demands that meaningful hearings in these cases not be further delayed.

### 4. Respondents' Interests Can Easily and Efficiently be Accommodated

Respondents conducted secret, extrajudicial proceedings, the so-called Combatant Status Review Tribunals ("CSRT"). Despite this, the Respondents have not met the requirements of *Rasul* and the habeas statute. Section 2243 requires the prisoner's custodian to,

7

within three days of the court's order, make a return certifying the true cause of the detention. 28 U.S.C. § 2243. Then a day is to be set for a hearing to determine the factual basis for the petitioner's detention. Id. Respondents can satisfy this statutory obligation by presenting the results of the CSRT to the Petitioner and the Court and submitting to a hearing on the issue as to why the Petitioner should continue to be detained.

The Court has broad authority to structure the form of a habeas hearing. *See id*. If the government believes that the actions of the CSRTs were adequate and compelling, it can offer those findings at a hearing before this Court. The parties may then argue to the Court about the appropriate weight the CSRT findings deserve. In this way, the Respondents' interests can be accommodated. The Petitioner would obtain discovery and, at a hearing, assert all of his traditional habeas corpus rights, again, as required by statute.

### B. Even if the Stay is Granted, the Respondents Should Be Ordered to Produce the Petitioner's Factual Return

#### 1. The Factual Return is Essential to Preparing Petitioner's Case

Should the Court grant the Respondents' Motion, it should nevertheless not excuse the Respondents from providing the Petitioner's factual return to counsel promptly. As noted in Petitioners' Motion for an Order to Show Cause, this Court has ordered Respondents to provide factual returns in other Guantanamo detainee cases, due to their importance in preparing the petitioners' cases. *Al-Wazan v. Bush*, 05-CV-329 (PLF), slip op. at 1 (D.D.C. June 14, 2005) (ordering the government to produce factual return within 90 days); *Mokit v. Bush*, 05-CV-621 (PLF), slip op. at 1 (D.D.C. June 16, 2005) (ordering the government to produce factual returns within 90 days of the Court's Order or within 90 days of the conclusion of the CSRT proceeding, whichever is later). *See also*, *Kurnaz v. Bush*, 04-CV-1135 (ESH), 2005 WL 839542, at *1 (D.D.C. Apr. 12, 2005) (stating that habeas counsel require access to the full

8

factual returns now "to ensure that the proceedings can continue in an orderly fashion"); *Al-Adahi v. Bush*, 05-CV-280 (GK), slip op. at 2 & n.1 (D.D.C. Apr. 29, 2005) (ordering production of factual returns so petitioners' counsel "can begin preparing their defense"); *Al-Anazi v. Bush*, 05-CV-0345 (JDB), slip op. at 20 (D.D.C. Apr. 21, 2005) (staying proceedings but ordering Government to produce factual returns, noting that "the factual returns appear necessary for petitioners' counsel effectively to represent petitioners," and that "even initial conversations by counsel with their clients may be very difficult without access to that basic factual information"); *Tumani v. Bush*, 05-CV-0526 (RMU), slip op. at 2 (D.D.C. Apr. 19, 2005) ("[P]etitioners' counsel should be able to review the returns now so that they can develop their case and prepare for any consultation with their clients."); see also *Al-Shamri v. Bush*, 05-CV-551 (RWR), slip op. at 4 (D.D.C. May 10, 2005) (staying proceedings but ordering the Government to produce factual returns); *El-Banna v. Bush*, 04-CV-1144 (RWR), slip op. at 7 (D.D.C. Apr. 8, 2005) (same); *Al-Oshan v. Bush*, 05-CV-0520 (RMU), slip op. at 2 (D.D.C. Apr. 7, 2005) (same); *Er-rachidi v. Bush*, No. 05-CV-00640 (EGS) (D.D.C. Apr. 21, 2005) (minute order) (same); *Al-Mohammed v. Bush*, 05-CV-00247, slip op. at 2-3 (D.D.C. Apr. 30, 2005) (stating that "petitioners' counsel must have access to [the returns] in order to develop a meaningful understanding of the basic factual allegations...and prepare for consultation with their clients.").

As these decisions have made clear, the factual returns have been critical. They have enabled counsel to interview their clients, their clients' families, and others on a focused and informed basis, and otherwise to investigate and prepare their clients' cases – and to do so while memories are still fresh, witnesses and documents still available, and other evidence still within reach. For these reasons, and those raised in the aforementioned decisions, the Court should not stay Respondents' obligation to provide the return in this case.

9

### 2. Provision of the Return is not Burdensome to Respondents

Respondents complain that providing Petitioner's return would "burden" them. Respondents' Motion at 12. As discussed above, any such burden to Respondents, however, does not outweigh Petitioner's interest in ensuring the investigation and preparation of his case before the evidence is lost forever and in being able to proceed without delay when the issues under appeal are resolved.

Respondents' asserted "burden," moreover, is greatly overstated. The factual return is most likely the record of the proceedings before the CSRT. That record already exists. Classification decisions regarding the information in the record of those proceedings were most likely made *before* the proceedings began, and the entirety of the proceedings underwent legal review upon their completion. The only "burden" facing Respondents now is photocopying, sorting, and stapling.

Respondents claim that the returns would be useless to Petitioner's counsel because counsel could not share with the Petitioner the classified information in the return. Respondents' Motion at 12. However, not all information in the return is classified. The allegations against the Petitioner, which are set forth in the return, are not classified. The return also includes (1) an unclassified discussion of the classified information in the return; (2) an unclassified summary of the transcript of the CSRT hearing, including any statement or testimony by the Petitioner or his "personal representatives;" and (3) other unclassified information that other counsel have found highly useful in their representation of other detainees. And, although counsel may not disclose classified information in the return to the Petitioner, knowing that information enables counsel to focus their investigation and preparation.

10

Finally, Respondents speculate that providing the return in this case would increase the risk of inadvertent disclosure – or other compromise – of classified information. Respondents' Motion at 12. This speculation lacks basis. Only counsel who have been granted security clearances and submitted themselves to a stringent Protective Order may see the classified information in the returns. "The Government's decision to grant an individual attorney at security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance." *Al Odah v. United States*, 346 F.Supp.2d 1, 14 (D.D.C. 2004).

### C.   The Request for "Rolling" Production of Returns Should be Denied

Included in the motion is a remarkable request that the government be excused from the statutory requirement that it make prompt return of its grounds for holding the Petitioner. Again, the return date for a habeas corpus petition is three days. 28 U.S.C. § 2243. Extensions beyond 20 days are not permitted. *Id*. This section is more than a plain requirement of Congress. It reflects a deep belief in our legal culture that few things are so offensive as extrajudicial detention by the Executive, a proposition affirmed by *Rasul*.

No basis has been shown for excusing this mandatory statutory duty. Petitioner cannot begin to prepare his case without knowing the government's allegations. That part of the Motion must be denied.

## IV. Conclusion

**WHEREFORE**, Petitioner Waleed Saeed Bn Saeed Zaid humbly requests:

1. That the Motion to Stay be denied outright;

2. That the Government be compelled to make prompt factual return pursuant to 28 U.S.C. 2243;

3. That a protective order be entered and that counsel and client be permitted contact; and,

4. That the Court grant such other and further relief as may be just and proper.


Dated:    September 29, 2005                Respectfully submitted,

                                            Counsel for Petitioners:


                                            _/s/_____


                                            Judith Brown Chomsky, Esq. (PA21537)
                                            LAW OFFICES OF JUDITH BROWN CHOMSKY
                                            Post Office Box 29726
                                            Elkins Park, PA 19027
                                            Telephone: (215) 782-8367
                                            Facsimile: (215) 782-8368

Case 1:05-cv-01646-UNA     Document 10     Filed 09/29/2005     Page 13 of 13